# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GREENSTONE FARM CREDIT SERVICES, ACA, et al.

        Plaintiff,

v.                                                                              Case No. 10-C-1175

GARY ORT, et al.,

        Defendants.

**ORDER AWARDING DAMAGES DUE TO FRAUD**

        The parties came before the Court for a one-day hearing on damages following this Court's grant of default judgment against Defendant Gary Ort, who appeared *pro se*. The actual amount of damages was not in question: the Plaintiff has demonstrated exactly how much Mr. Ort owes it on its promissory notes. Instead, because Plaintiff fears that Ort will simply declare bankruptcy due to the large ($20+ million) judgment against him, it sought to establish that at least part of that amount was due to Ort's fraudulent conduct. A finding of fraud would mean that those damages would not be dischargeable in bankruptcy.

        The hearing was of a piece with other proceedings in this action. At the outset, Ort sought (as Plaintiff predicted) to postpone the hearing due to what he claimed were medical issues relating to his high blood pressure and anxiety. Earlier proceedings had already established that Ort's credibility was low, and his frequent efforts to delay these proceedings through stonewalling and other means suggested that his current health claim should be taken with a grain of salt. This was particularly true since his wife had made similar claims of anxiety in refusing to testify at a previous

deposition. True to form, she apparently appeared at the courthouse for *this* hearing, but according to Ort she had remained outside, in tears, unable to come into the courtroom. Under the circumstances, I found it incredible that two people involved in running multi-million-dollar businesses would so conveniently (and independently) fall under the spell of crippling anxiety whenever they are asked to testify or appear in court.

In any event, giving Ort the benefit of the doubt, I further concluded that his medical claims were chronic ones, meaning that even if the hearing were postponed he would likely have the same difficulties appearing at any future hearing. That is, if he has high blood pressure and anxiety today, he will likely have them in a week or a month or whenever another hearing could be arranged. Thus, it made little sense to postpone a hearing on his behalf when there was a high probability he would not be able to attend any future hearings as well. Finally, I was sympathetic to the concerns of opposing counsel, who has had to live in the trenches fighting off Ort's delay tactics and deceptions. His client should not have to incur additional expenses due to rescheduling. For these reasons, it made sense to proceed with the hearing as scheduled. It was explained that there was no requirement that Ort himself attend the hearing, and he thus understood that if he became ill or uncomfortable he was able to leave at any time. He remained for the entirety of the seven-hour hearing and vigorously, if ineffectually, questioned witnesses and testified on his own behalf. I am satisfied that he was not hamstrung by any medical limitations.

Before addressing the specific assertions of fraud, it is worth exploring the more general principle at work here. In essence, Plaintiff believes that the loans Ort obtained for Aacer and Wolf River were used not for those companies' ongoing operations but were instead funneled to Ort himself, his relatives, or to an Ort-controlled company in which Plaintiff had no security interest,

for unspecified private uses. By stripping the funds intended for Aacer and Wolf River, Ort's activities had the effect of harming those companies' operations (and ability to repay the loans), and it also impaired Plaintiff's collateral in those companies. And certainly it is at least implicit in a commercial finance transaction that the company obtaining the financing will be the entity *using* the financing. If you go to the bank and receive a personal loan, you are free to do whatever you want with it. For that privilege, the bank typically charges a higher rate of interest. But a secured loan to a corporation has strings attached, the most obvious one being that the funds must be used by the company, or at the very least that the funds not be depleted for the personal gain of the owner. The Orts were under a continuing duty to avoid depleting the collateral of their lender and to fully disclose their activities. By failing to do so, the lender continued to extend credit, to its detriment.

The underlying theory of fraud had not been examined in any depth, however, likely due to the fact that default judgment had been granted against Ort. Although the default judgment against Ort essentially answers the question of Ort's liability for fraud (fraud claims were pled in the complaint), I asked for further briefing on the underlying theory of fraud in order to insure that the Plaintiff was actually entitled to judgment. The Plaintiff has now provided additional support for its theory that Defendant Gary Ort engaged in fraud when he appropriated funds loaned by Plaintiff to his companies for his own personal uses. In particular, Plaintiff relies on the Uniform Fraudulent Transfer Act, Wis. Stat. Ch. 242. "The Uniform Fraudulent Transfer Act reflects a strong desire to protect creditors and to allow for the smooth functioning of our credit-based society." *Badger State Bank v. Taylor,* 2004 WI 128 at ¶ 41, 276 Wis.2d 312, 330, 688 N.W.2d 439, 448 (Wis. 2004). In that case, the courts found a fraudulent transfer when the debtor company cancelled an account receivable (an asset) in exchange for forgiveness of an unrelated debt owed by another company that

3

was not a debtor to the bank. In short, the transaction took assets out of the debtor company and moved them to the non-debtor company. That is, in essence, what occurred here. The allegations, which are taken as true by virtue of the default judgment, and which are supported by my findings below, show that Ort essentially treated his companies as a personal piggy bank without any regard for the fact that the Plaintiff had security interests in those companies. The specific allegations and my findings are set forth below.

The Plaintiff's theory of fraud is four-fold. First, it asserted that while Ort was in charge of Wolf River Lumber, he received payments of $2.97 million from the company in the form of "advances," which he never repaid. Michelle McHale-Adams, a forensic accountant, testified credibly that Ort attempted to reclassify these payments as "consulting" fees or mask them in other ways. Although Ort contested whether all of these checks ended up in his own accounts, he was not persuasive. In fact, he identified no plausible reason why Wolf River would have paid him three million dollars over the period in question. Statutory interest at 5% adds onto his advances another $1,096,902. That is, not only did the borrower, Wolf River, lose the $3 million, but it lost another million by not receiving interest on that money (or other economic benefit) due to Ort's fraud.

Second, Plaintiffs showed that Wolf River and Aacer overpaid for lumber purchased from Ort's other company, Northern Components. Ms. McHale-Adams testified credibly that her firm had examined several months' worth of timber purchases. A comparison of the price paid for the lumber with the actual value of the lumber (as determined by the Hardwood Market Report) revealed an overpayment of nearly $200,000. In other words, Wolf River was paying well above market prices for lumber. Ort offered no plausible reason for this. He asserted that sometimes it was worth paying "above market" prices if the quality was particularly good, as he claimed Northern

4

Components' was. Here, the testimony credibly showed that Northern Components' lumber was *not* of superior quality, and in fact that it was of *lower* quality altogether. A chart from Aacer that measured the quality of its vendors' wood placed Northern Components' wood *dead last* in terms of the desired product. (Ex. 17.) Very little of its wood was of the desired width: the goal was to have boards of six inches or wider, and many vendors' product met that goal at a more than a fifty percent rate. By contrast, more than fifty percent of Northern Components' wood was only four inches wide, and thirty-four percent was only *three* inches wide— a glaring discrepancy considering that all the other vendors averaged only about *one* percent of three-inch boards. (The next worst was 6.3 percent.) In short, the record was beyond debate that Ort's company, Northern Components, was selling substandard wood at above-market prices. Extrapolating from the data analyzed, the total amount of overpayment for Northern Components wood is estimated to be between $1,463,574 and $1,638,651. Ort did not provide a convincing reason to prefer the lower number; the higher number reflects a reasonable extrapolation based on the unavailability of certain records.

Third, Ms. McHale-Adams explained how Ort had overpaid for a piece of equipment, namely, a ripsaw. Ort purchased the ripsaw in 2003 for $84,000, but then Wolf River "leased" it from him for $48,000 per year, paying more than half of the purchase price each year. Based on actual and estimated payments (not all records were available), McHale-Adams testified that Wolf River overpaid for "leasing" the ripsaw between $169,000 and $221,000. (And that assumes Wolf River even needed a ripsaw in the first place.) Ort's explanation was vague and unpersuasive, and there is no reason to assume that Wolf River paid any less than the high end of McHale-Adams' estimate.

5

Finally, Wolf River paid the premiums on life insurance policies that were owned by Ort's daughters. Although it is routine for companies to obtain life insurance on executives, there is no business reason to obtain such insurance when the beneficiary is a third party. The total premium payments for these policies was $78,454.

In sum, I find that Defendant Gary Ort diverted some $6,004,998 in loans from Plaintiff into either his own pocket or his relatives'. This amount constitutes a fraudulent transfer at the expense of the creditor, Greenstone.

Dated this ____17th____ day of August, 2012.

    s/ William C. Griesbach
William C. Griesbach
United States District Judge